# SUPREME COURT OF TEXAS.

## GALVESTON SESSION, 1875.

43   1
90   86

JORDAN WILLIAMS AND OTHERS v. QUINCY DAVIDSON AND OTHERS.

1. NUISANCE. See statement of the case for facts which, if true, will entitle a party to maintain a suit for equitable relief against one who obstructed a public highway if the obstruction is of a character to constitute a nuisance.

2. COLONIZATION LAWS. The colonization laws in force in 1836 had no application to the condition of the city of Victoria, or its government after the change of government in 1836, and conferred no power on the City Council of said city to grant a franchise of a toll bridge in 1865.

3. RIPARIAN PROPRIETOR. The riparian proprietor may be given a preference over others when applying for the right to exercise a franchise (*i. e.*, a toll bridge), but his position in that respect does not confer the franchise.

4. PRESCRIPTION. When the mode of granting a particular franchise for more than thirty years has been, by notorious public act, such as an act of the Congress of the Republic, and afterward of the State, a claim to such franchise cannot be established by usage alone for thirty years, when no complaint is made of the loss or destruction of the records evidencing the grant.

5 POWER OF A CITY TO GRANT A FRANCHISE. The power of the mayor and aldermen of an incorporated city to grant to private parties a franchise to erect a toll bridge across a river flowing through the city, was predicated on the following clauses in the charter of incorporation, viz. : " The mayor and aldermen shall have the power to enact and enforce " such ordinances and regulations as they may deem necessary for the " government of said town ; provided the same do not conflict with the " Constitution and Laws of the Republic," and " shall have entire police " of said town." *Held,* 1. That these are nothing more than the ordinary powers granted to towns and cities for the exercise of their municipal authority. 2. That they do not embrace by fair implication the high governmental power of granting a franchise of a toll bridge to individuals. 3. If the building of the bridge is necessary for the convenience or conducive to the general interests of the inhabitants of the city, the city will have the right to build it as a free bridge, to be paid for in a way clearly within the scope of its municipal authority, by taxation, but will not have

1

the right to erect a toll bridge, to be paid for by unequal burdens in the way of tolls, and resulting in embarking the city in a private partnership enterprise with individuals for profit, under the cover of exercising the municipal authority for the accomplishment of a public purpose.

6. CONSTRUCTION OF MUNICIPAL CHARTER.   The charter by which a municipal corporation is created is its organic act.   It can do no act and make no contract not authorized thereby ; and all acts done by it beyond the scope of its powers are void.

7. CORPORATIONS.   Courts should require of corporations in all cases to show a plain and clear ground for the authority they assume to exercise.

8. A court in charging a jury cannot assume material facts as established, which it is incumbent on the party claiming the benefit of them to prove. This is practically to dispense with the services of a jury in their appropriate duty of finding the facts.

APPEAL from Victoria.   Tried below before the Hon. D. D. Claiborne.

Davidson and others claimed to be owners of an iron bridge which spans the Guadalupe river at the town of Victoria.   The town tract, consisting of four square leagues, lies in nearly equal parts upon each side of the river; while the town proper, one mile square, lies upon the east side.   Between the blocks and lots of the town proper and the river's edge, there is a reservation seventy-five varas wide for public uses, and called the levee; and on the opposite side there is a like reservation, between the river and the farm lots lying opposite the town proper.   The bridge abuts on this reservation on each side, and connects with the town by a short road or approach, that has been made across the levee, and which strikes obliquely on the streets of the town proper.

The plaintiffs alleged themselves to be residents of the town tract, on the west side, or residents of the town proper, owning and cultivating land on the west side, and they brought this suit to enjoin the defendants from charging them toll for crossing the bridge, and to compel the defendants to allow a free passage across it to the plaintiffs, their families, and teams, and to all other residents of the town tract of Victoria.

The petition of the plaintiffs set out that they sue for them selves, and all other inhabitants of the town tract. They alleged that the bridge is situated at the foot of Bustamente street, and in a highway of the town ; that it touches the west bank of the river, where the roads from Goliad and other places cross it, and is therefore part of the public highway leading into the town from the west; that the land upon which the bridge stands is the property of the town, held in trust for the benefit of the inhabitants ; that the defendants demand toll of the plaintiffs and other citizens of the town tract, at half rates for ordinary crossing, and at full rates when engaged in transporting merchandise, etc. ; that defendants claim the right to keep the bridge and demand toll, under a contract made by the town with J. O. Wheeler, in 1865, which contract was sold by Wheeler's administrator after his death, and now belongs to defendants ; that under the contract with Wheeler, he was to have the exclusive right to keep a toll bridge for fifteen years; he was to erect a wooden bridge and keep it in repair, and rebuild it if destroyed; he was to have the privilege of obstructing the fords of the river up the town tract, and keeping them obstructed, and was to allow the people of the county to pass free over the bridge in their ordinary crossing, but not when driving stock, transporting merchandise, etc. It was also stipulated that the town would not keep or authorize any other bridge or ferry, and that at the end of fifteen years the bridge should become the property of the town. The petition further alleged, that after Wheeler's death, the bridge was destroyed by high water, and the contract or franchise was sold; that afterward, modifications of the contract were made, first by agreement of the town council with the first purchasers, and afterward with the defendants, by which agreements it was attempted to confirm to the defendants all the rights held by Wheeler, with the modifications that the term should be extended for ten years longer; that the defendants should build an iron bridge; that they should pay over to the town twenty-five per cent. of the net income; that the free crossing should

be abolished, and that the inhabitants of the town and county should be charged toll at half rates for their ordinary crossing, and full rate when transporting merchandise, etc. The petition further alleged that the County Court of Victoria county had fixed the rates of toll for the bridge, but had not authorized the defendants to erect a toll bridge; that the defendants were not incorporated, and that no authority to erect a toll bridge had been granted to them by the Legislature of the State. That, in 1865, there was a good ford across the river about three hundred yards above the site of the bridge; that Wheeler obstructed this ford, and that the defendants had kept up the obstructions, and that the municipal government of the town had acquiesced in these obstructions under the contract, and had abstained from establishing other fords, ferries or bridges.

The relief prayed for was, that the defendants might be "perpetually enjoined from demanding or receiving toll for "the passage of any residents of the town of Victoria, or of the "property of such residents, over the bridge of defendants here-"in described; or over any bridge they, under their said con-"tracts, may erect in place of the present, should the same be "destroyed; or over any ferry that the defendants may use in "place of said bridge, should the same be destroyed."

By amendment, the plaintiffs afterward alleged that Bustamente street, by a deflection, crossed the levee and reached the bridge, and that the highway from the west crossed the levee to the bridge on the west side. They also alleged that their land, on the west side of the river, was depreciated in value, because they had to pay toll on the bridge in hauling the products to market.

By further amendment, they excepted the Hon. T. C. Barden (the judge of the court) from the inhabitants of Victoria, for whom they sued, and for whom they prayed the relief above stated.

The defendants excepted to this petition, on the ground that the matters and things alleged in it, did not entitle the plain-

tiffs to the relief they asked, nor to any relief that could be granted under their prayer for general relief.

The court overruled these exceptions, and this ruling was assigned for error.

The defendants answered. In addition to a general denial, they set up special defenses, as follows:

"*First.* They admitted that they owned an iron bridge, "which they had erected at great expense, under a contract with "the town of Victoria, and that they charged toll from the "plaintiffs and others, whenever they chose to cross the bridge.

"*Second.* They set up the contract made by the town with "Wheeler, April 17, 1865, which they alleged was made as a "substitute for and in extension of a previous contract, made "by the town with Owens & Sutton, in 1849, and of which "Wheeler had become the owner. They also set up the mod- "ifications of the contract of 1865, made by agreement between "the defendants and the town council. They insisted that "the town of Victoria had the legal right and power to make "the contracts, and to make the modifications of them; that "the town of Victoria had always had and exercised the right "and power to establish ferries or toll bridges across the Gua- "dalupe within her limits; that she derived this power from "her organization under the colonization laws of Coahuila and "Texas, and also from the provisions of her charter granted by "the Republic of Texas, on the 5th of February, 1840.

"*Third.* That the town of Victoria had for more than thirty "years claimed and exercised the exclusive right to establish "and keep either a ferry or a toll bridge across the·Guadalupe "river, within the town tract; and for the same length of time "had claimed and exercised the right to grant, by contract, to "individuals, the exclusive privilege of keeping either a ferry "or a bridge, as the case might be, and that this claim and "right of the town had been recognized, for the same length "of time, by the County Court of Victoria county; that this "right was recognized by said court by granting license to the "town to keep a public ferry—which license was granted in

"1840, and afterward, till the first bridge was finished in 1851,
"and was granted thereafter whenever a resort to a ferry be-
"came necessary by reason of the destruction of the bridge;
"that said court recognized the right of the town to grant the
"exclusive privilege of keeping a toll bridge; for that in 1849,
"after the town had, by contract, granted to Owens & Sutton
"the exclusive right to keep a toll bridge for a term of twenty
"years, the said court, by order, granted license to said Owens
"& Sutton to keep such toll bridge for twenty years from first
"of January, 1850—the court binding itself to renew the li-
"cense annually, if necessary; and that said court had further
"recognized this right, by making orders, from time to time,
"to establish and regulate rates of toll upon the bridge erected
"by Owens & Sutton, upon the several bridges erected by
"Wheeler, and upon the iron bridge erected by the defend-
"ants.

"*Fourth.* The answer further stated that the bridge built
"by Owens & Sutton was washed away; that J. O. Wheeler be-
"came the owner of their contract, and that he erected a new
"bridge at a new place, some one hundred and fifty yards fur-
"ther down the river; and that this bridge was destroyed by high
"water during the war.   That in April, 1865, the town of Vic-
"toria and said Wheeler made a new contract, the old contract
"then having about five years to run.   By this new contract,
"Wheeler agreed to build a new bridge, with the privilege of
"keeping the same as a toll bridge for fifteen years from that
"date.   That Wheeler erected the bridge called for by his con-
"tract, but that after his death, and in 1869, it was destroyed
"by high water; that the contract or franchise was sold by his
"administrator, and afterwards became vested in the defend-
"ants; that it had been several times modified, by consent of
"the town and defendants, and that under the contract, as
"modified, these defendants had erected an iron bridge, at the
"site of the Wheeler bridge, and at a cost of more than fifteen
"thousand dollars.

"*Fifth.* The defendants denied that they had demanded

" of the plaintiffs, or others, any tolls, except as they were en-
" titled to demand the same under the contract with the town,
" and according to the rates established by the County Court.

" *Sixth.* The defendants denied that their bridge stands in
" Bustamente street, or any other street, and denied that it
" forms part of any highway, or is in the line of any highway
" except such highways as have been made, or changed, for the
" purpose of reaching the bridge.

" *Seventh.* They denied that they have placed or kept any
" obstructions in the ford mentioned.

" *Eighth.* The defendants alleged that the town of Victoria
" had for more than thirty years claimed and exercised the right
" of granting by contract the exclusive privilege of maintaining
" a ferry or keeping a toll bridge across the Guadalupe river,
" within her limits; and that the Republic of Texas, during its
" continuance, and the State of Texas, from its organization, in
" 1846, to the present time, had acquiesced in the exercise of
" that right by the town.   That, in 1849, the town exercised
" that right by granting to Owens & Sutton the exclusive priv-
" ilege of keeping a toll bridge; that it exercised it again, in
" 1865, by renewing and extending that privilege to J. O.
" Wheeler; and exercised it repeatedly since, by the several
" modifications of the Wheeler contract, made by agreement
" with the purchasers and holders thereof; and that on all
" these occasions, and on all others, the exercise of this right
" by the town was acquiesced in by the State of Texas, by the
" County Court of Victoria county, and by the inhabitants of
" the town and county.   Wherefore the defendants said, that
" if the right of the town to grant such exclusive privilege was
" not originally conferred by law, it had become vested by the
" long use and exercise of the same, and the long acquiescence
" aforesaid.

" *Ninth.* The defendants further say, that under the exclu-
" sive privilege granted to Owens & Sutton, continued and
" regranted to Wheeler, and now held by the defendants, there
" has been continually kept and maintained a toll bridge across

"the Guadalupe river, at the town of Victoria, from the year "1850 until the present time, excepting only the intervals when "the bridge having been swept away by high water, had not "yet been rebuilt, in which intervals the place of a bridge was "supplied by a ferry, maintained by the holders of the bridge "franchise, and operated under contract with the town. Where- "fore the defendants say that they, and those whose right they "hold, have for more than twenty years used, exercised, and "enjoyed, the peaceable, adverse, and uninterrupted right of "keeping a toll bridge across the Guadalupe river, at the town "of Victoria. .

"*Tenth.* The defendants further say, that besides the labor "and expense of building the bridge they are bound by their "contract, under penalty of forfeiture, to keep it in repair, and "to rebuild it if destroyed, to pay over quarterly one-fourth "of the net income to the town, and, at the expiration of the "term, to turn over the bridge itself, as the property of the "town; and that, meanwhile, the town retains its jurisdiction "over the bridge, and has, by the contract, the right to super- "vise its condition and compel repairs to be made upon it.

"*Eleventh.* The defendants further allege, that the bridge is "necessary for the convenience of the inhabitants of the town; "that the town was not able to build it by its own resources, "and that the expense and risk were so great that the bridge "could only be built by granting the exclusive privilege of "keeping it as a toll bridge for a term of years; that the bridge "erected by defendants is a great public benefit, and that it "affords to the plaintiffs, and all others, a passage across the "river, safer, more convenient, and cheaper, than could be "provided by any other means, if the bridge were removed; "and that it yields a large revenue to the town, and thereby "greatly lessens the burden of taxation."

The plaintiffs filed exceptions to all the special matters of defense set up by the defendants. The court sustained all the exceptions; and this ruling was assigned for error.

At the trial the judge peremptorily instructed the jury that

the defendants had shown no legal right to demand or receive toll upon their bridge; that the town of Victoria could not confer such right, and that they should find for the plaintiffs.

A verdict having been rendered for the plaintiffs in accordance with this instruction, the court entered a decree, perpetually enjoining the defendants from demanding toll of the plaintiffs, or of any other permanent resident of the town (except Hon. T. O. Barden), for the passage of themselves, families, employees, animals or vehicles, over the iron bridge of defendants, or over any bridge or ferry they might erect or keep in its place; and also decreeing that the plaintiffs and all other permanent residents of the town (except said Barden) have a free passage for themselves, families, employees, animals, and vehicles, across the bridge of the defendants, so long as it is maintained and operated in its present location, under the contracts referred to.

The defendants moved the court to correct the decree, so as to confine it to the plaintiffs named in the petition; but this motion was overruled; and this ruling was assigned as error.

The evidence disclosed that at the time the bridge of appellants was erected, the contract between appellants and the town of Victoria provided that the inhabitants of the town should have free crossing over the bridge while engaged in their ordinary occupations; that by the contract under which the appellants claimed, Wheeler was " authorized and empow-
" ered to obstruct, so as to prevent the use of the same, all the
" fords, present or future, on the Guadalupe river within the
" limits of the town tract of Victoria upon public highways, or
" used now or hereafter as public highways, and to keep the
" same so obstructed so long as the said Wheeler shall provide
" a bridge or ferry for the passage of persons and property
" across said river, in accordance with this contract;" that, after granting to Wheeler the right to construct the bridge, the following provision was incorporated in the contract: " And
" the said parties of the first part do hereby bind themselves
" and their successors in office not to build or keep a bridge or

" ferry across the said river, on said town tract, or authorize it
" to be done, until after the termination of the said period of
" fifteen years ; " that the rights of Wheeler, under his contracts
with the town, were all vested in the appellants, by the several
contracts made between the town and the appellants, with an
extension of ten years' time.    The contract of the appellants
with the town will expire in the year 1890.

The evidence shows that for the last forty years the highways
leading from the west have crossed the Guadalupe river near
and at the place where the bridge now stands ; that they have
all entered upon the reservation at or a short distance above
where the bridge now stands, as the means of crossing the river
demanded ; that it has in effect been the same road at all times ;
and that there was no other public road leading into the town
of Victoria from the west ; that the four leagues of land over
which the town has jurisdiction embrace a water front on each
side of the Guadalupe river, six miles in length ; that Busta-
mente (Bridge) street extends to the river, and did so prior to
Wheeler's contract ; that the bridge built by Owens and Sutton
was built in 1851, and stood about one year, and, during the
existence of that contract, no fords were obstructed ; that the
tolls charged against the appellees from the 16th of July, 1872,
to September 8, 1873, amounted to more than one thousand
dollars ; that lands on the west side of the river were dimin-
ished in value by the closing of the ford and establishment of
the toll bridge.

*Glass & Callender*, for appellants.    The charter of the town
granted by the Republic of Texas, February 5, 1840, contains,
among others, two grants of power, either of which we take to
be sufficient to authorize the town to erect and keep a toll
bridge, or to contract with individuals to erect and keep it.
The first grant of power to which we refer is in the 6th Section,
and authorizes the town council " to enact and enforce such or-
" dinances and regulations as they may deem necessary for the
" government of said town ; provided the same do not conflict

" with the Constitution and laws of this Republic." This is the power of local legislation, which, it has often been held, the State might well confer upon a municipal corporation, and which, as was well said by the Supreme Court of New Jersey, " is, so far as it extends, a grant of sovereignty." (State *v.* Clark, 1 Dutch., 54; and Cooley on Cons. Lim., p. 191, and authorities there cited.) The jurisdiction of the town extended over the four leagues which constituted the town tract (Charter, Section 2), and, within that territory, the power of legislation conferred upon the Town Council was limited only by the restriction that their ordinances should " not conflict with the Constitution and " laws of the Republic." Did an ordinance which authorized the erection of a toll bridge across the Guadalupe, within the town tract, conflict with that Constitution or those laws? If so, how and where? It is not pretended that there was any provision of law which forbade the town of Victoria to erect a toll bridge, nor that there was any such prohibition upon the towns of the State generally. Ordinances and regulations that did not conflict with the Constitution and laws of the Republic must mean all such local legislation as the Republic herself might have enacted without violating her Constitution or conflicting with her general laws; it follows that the town might grant it under the authority of local legislation conferred by the Republic and continued by the State.

There is nothing in the history of the country to give countenance to the idea that a free bridge was expected. It is not usual for bridges over such streams as the Guadalupe, at Victoria, to be free bridges; and it would have been absurd, in 1840, when the charter was granted, for any one to expect the erection of a free bridge, across such a river, in a region of so little population and wealth as the region of Victoria, and Victoria county, then was. Free bridges were no more to be expected than free ferries, and no sane man expected to find either.

We conclude then that the authority to erect this toll bridge is necessarily implied in the power of local legislation conferred by the charter; for if the Republic herself—without making

any change in her Constitution or her general laws—could have authorized the erection of a toll bridge, by a direct grant of a franchise, then it was not in conflict with that Constitution or those laws for the town to grant that franchise, under the powers of local government which the charter had conferred.

But the authority of the town to erect a toll bridge is, as we understand it, also implied and conferred by another clause of the same section of the charter. It is there declared that the town council " shall have entire control of the police of said " town." What is implied and comprehended in this grant of power? Surely it does not mean merely the control of the constabulary force—the marshals and constables. This is but one, and an insignificant department of police. The Congress of the Republic had doubtless reference to police power in the sense in which jurists and legislators generally understand it ; as the power which extends to and controls all internal regulations of the local community—which controls the intercourse of the inhabitants, and has special reference to all the means and avenues of inter-communication—providing and controlling all roads, and streets, and ferries, and bridges, by which the citizens may pass from one part of the town to the other.

A brief reference to the authorities will show that we have not misstated the proper scope of police power. Jeremy Bentham distributes it into eight branches, and of these he designates the fifth as the " Police of Interior Communications." (See Edin. edit. of works, Pt. 9, 157, and cited by Cooley, Cons. Lim., note 1, 572.) Chief Justice Shaw, of Massachusetts, described the police power, as " the power vested in the " Legislature by the Constitution, to make, ordain, and estab- " lish all manner of wholesome and reasonable laws, statutes " and ordinances, either with penalties or without, not repug- " nant to the Constitution, as they shall judge to be for the " good and welfare of the commonwealth, and of the subjects " of the same." (Com. v. Alger, 7 Cush., 84.) And Chief Justice Redfield, of Vermont (in Thorpe v. Rut. and Bur. R. R. Co., 27 Vt., 149), declared that " by this general police power

" of the State, persons and property are subjected to all kinds " of restraints and burdens, in order to secure the general com- "fort, health and prosperity of the State." (See Cooley on Cons. Lim., 573, 574.) And it has been repeatedly held that the construction of bridges over navigable streams, as well as other streams, is a proper exercise of the police power of the State. (Ibid., 592; Dill. on Corp., Section 97.)

Nor were the authorities of the town restricted to any particular mode in which they might establish a bridge. They might, if they had thought fit, have raised by taxation the fund necessary to build the bridge, and might have made the tolls a perpetual revenue for the town, like the rent of stalls in a market-house; or they might have made it free, either immediately or after a term of years.

If the bridge had even been erected in a highway already established, it would not, for that reason, have been free for the use of the public, without the owner's consent. This point was virtually decided in the case of the Jersey City and Bergen Railroad Company *v.* Jersey City and Hoboken Horse Railroad Company (20 N. J., 61). In that case it was held that the rails of a horse railway, laid down in the street of a city, were not abandoned to the public or the city, or to other railway companies; and that it was "not competent for any person, nat- " ural or corporate, at his mere will, to appropriate the track " of a horse railway company to his own use and convenience, " by adapting his carriage to such use for that purpose."

In the case above mentioned, the court decided that " the "Legislature have the right, which is generally delegated to " the municipal government, to regulate the manner in which a " road or street shall be formed and used." * * * " That " the State, or those to whom it has delegated the authority, " has the right to set apart a proper portion of the street for a " street railroad, if that railroad is to accommodate the public " travel, for which the street was designed." * * * " And " that it makes no difference that the road is constructed and " operated by an incorporated company for their own gain."

Such an appropriation of a portion of a public street has been sustained by the courts in other cases.    (See Dillon on Corp., Section 558 and note ; R. R. Co. *v.* Applegate, 8 Dana, 289 ; Wolfe *v.* R. R. Co., 15 B. Mon., 404; R. R. Co. *v.* Brown, 17 B. Mon., 763 ; Slatten *v.* R. R. Co., 29 Iowa, 148; In gram *v.* Chic. R. R. Co., 34 Iowa, 249.   See also Brown *v* Duplessis, 14 La. An., 854 ; 2 Red. Railways, 373 ; Wilburn *v.* Cedar Rapids, 12 Iowa, 246 ; Brooklyn *v.* City R. R. Co., 47 N. Y., 475 ; Murphy *v.* Chicago, 29 Ill., 279 ; Henchman *v.* Pat. Horse R. R., 17 N. J. Eq., 75.)

" The proprietors of the adjoining banks have a right to use " the land and water of the river, as regards the public, in any " way not inconsistent with the easement " of navigation.   (3 Kent's Com., 427.)

The ordinance of Congress, of 1787, declared the navigable waters leading into the Mississippi and St. Lawrence to be com mon highways, and forever free.   " But," said the Supreme Court of Ohio, " this provision did not abolish or impair the " common law principle that he who owns the land on both " banks owns the entire river, subject only to the easement of " navigation ; and he who owns the land upon one bank only, " owns to the middle of the river, subject to the same ease- " ment."   (Gavitt *v.* Chambers, 3 Ohio Rep., 496.)

If this rule should be regarded as in any wise affected by the provision of our statute that surveys should not run across navigable rivers, that statute does not touch this case ; for the town holds under the old Mexican survey of the town tract, which did run across the river, and which survey the Republic recognized and confirmed.

In the case of Dutton *v.* Strong, decided by the Supreme Court of the United States (1 Black. 23), one of the main questions was, whether a bridge pier, extended by the riparian proprietor for several hundred feet into the lake, and kept for private use, was a nuisance because erected without special authority from the Legislature ; and also, whether, for the same reason, the public could use it without the owner's consent ; and it was

held that it was not a nuisance, and that the public had no right to use it; and it was further held that a riparian proprietor had a right to construct such a bridge pier for private or for public use, if no positive law was violated in the erection, and it was not an obstruction to navigation.

In the case of Yates *v.* Milwaukee (10 Wall., 497), the same court asserted this right of the riparian owner with still greater clearness and force. Yates owned a lot upon one side of the Milwaukee river, a navigable stream, and declared by law to be a highway and forever free. He had extended a wharf one hundred and ninety feet, to the navigable part of the river, and the question was whether this was a nuisance, which the city authorities could abate under their power to establish wharf lines, etc. The court concede, in their opinion, that as the lot was probably a part of the public lands of the United States, the title of Yates was limited to the margin of the stream; and then proceed to declare:

" But whether the title of the owner of such a lot extends " beyond dry land or not, he is certainly entitled to the rights " of a riparian proprietor whose land is bounded by a navigable " stream; and among these rights are access to the navigable " part of the river from the front of his lot; the right to make " a landing, wharf, or pier, for his own use, or for the use of " the public, subject to such general rules and regulations as " the Legislature may see proper to impose for the protection " of the rights of the public, whatever those rights may be." *     *     *   " This riparian right is property, and is valuable, " and though it must be enjoyed in due subjection to the rights " of the public, it cannot be arbitrarily or capriciously destroyed " or impaired." (Ibid., 504; and see Pipkin *v.* Wynn, 2 Dev. (Law), 404; Bowman *v.* Watken, 2 McLean, 376.)

In the case of Johnson *v.* Erskine (9 Texas, 10), this court (per Judge Lipscomb) described the right to keep a ferry on one's own land as a "natural right," which the statute had abridged by requiring a license; and declared that, independently of all statutory enactments, the appellants in that case,

who had kept a ferry upon the Guadalupe, "were under no
"moral obligation to give a bond before they could exercise the
"privilege of keeping a ferry-boat upon their own lands, and
"demanding a compensation from those who received their ser-
"vices."

If this be so, the right remains a "natural right," not
abridged nor regulated by statute; and the town, as riparian
owner, might exercise it. If that law is in force, then we say
the bridge of the town was originally licensed by the County
Court, and has been recognized by that court ever since.

*Fourth.* If all other defenses should be deemed defective, we
insist that the title of the town and of the defendants under the
town to this bridge franchise, is sufficiently fortified by prescrip-
tion, and cannot now be disturbed. It was against the defense
by prescription that plaintiffs' exceptions were chiefly leveled;
and the main objection appears to be that it was an attempt to
prescribe against a public law.

We remark, here, that we are speaking of prescription proper
—of presuming grants of franchises and other incorporeal he-
reditaments—and not of presuming a grant of land by the
State; and the cases in Texas in which this court has refused to
presume such a grant of land for more than ten years' occupa-
tion, have no application to the case at bar.

That we have correctly stated the law in regard to grants of
franchises, etc., will appear from an examination of a few au-
thorities:

"Even a grant or charter from the crown, though it can only
"be by matter of record, may be presumed in favor of rights
"of which parties have long been in the quiet and peaceable
"possession, notwithstanding the maxim, *nullum tempus oc-*
"*currit regi.*" (3 Bacon's Abr., Title Evidence, 618, 619,
and authorities there cited.) "The general rule with re-
"gard to prescriptive claims is, that every such claim is good if
"by possibility it might have had a legal commencement (1
"Term R., 667); and from upward of twenty years' enjoy-
"ment of an easement or profit *à prendre*, grants, or, as Lord

" Kenyon said, even a hundred grants will be presumed, even " against the crown, if, by possibility, they could legally have " been made." (11 East., 284, 495; Chitty's note, 2 Black. Com., 265, side page.)

" In the United States," says Greenleaf, " grants have been " very freely presumed upon proof of an adverse, exclusive and " uninterrupted enjoyment for twenty years.  By the weight " of authority, as well as the preponderance of opinion, it may " be stated as the general rule of American law, that such an " enjoyment of an incorporeal hereditament affords a conclu- " sive presumption of a grant, or a right, as the case may be, " which is to be applied as a *præsumptio juris et de jure*, " wherever a possibility by right may be acquired in any man- " ner known to the law." (2 Green. Ev., Section 539).  As to ferry rights by prescription, see Harrison *v.* Young, 9 Geo., 363 ; Pipkin *v.* Wynn, 2 Dev. (Law), 406 ; Bowman *v.* Wathen, 1 How. (U. S.), 189.

It seems to us that this is decisive of the case at bar.  We show the " adverse, exclusive and uninterrupted enjoyment " for more than " twenty years," and we insist that the law pre- sumes our title good.

There is nothing in the corporate or municipal character of the town that precludes it from the benefit of prescription. (Cooley on Cons. Lim., 197, 254, and note 3 ; Kent's Com., 442; Dill. on Munic. Corp., Section 529, and note 2 ; Tyler on Eject. and Adv. Enjoy., 126.)  In the case that is usually cited to show that usage cannot confer a right on a town (Hood *v.* Lynn, 1 Allen, 103), it was admitted that the usage may be good, if it is of " long continuance," and is " necessary to the ex- " ercise of some corporate power, or the enjoyment of some cor- " porate right, or which contributes essentially to the necessities " of and convenience of the inhabitants."  And the usage in the case at bar is of this character.  It does contribute essentially to the necessities and convenience of the inhabitants of the town.

*Phillips, Lackey & Stayton*, for appellees.  The first ques-

tion in this case is, have the appellees the right to maintain this suit for themselves and for the other permanent residents of the town of Victoria.

Such right has long been recognized, where the question is one of general interest, and one or more sue, or defend for the whole; or where the parties are very numerous, and although they have or may have separate, distinct interests, yet it is impracticable to bring them all before court. (Story's Equity Pleadings, Sections 94–97, 113, 114, 114*a*, 115, 120,–123, 125, 126.)

The rule is well expressed in the case of Smith *et al. v.* Swormstedt *et al.*, 16 Howard, U. S., 302, in the following language : "The rule is well established, that where the par- " ties interested are numerous, and the suit is for an object " common to them all, some of the body may maintain a bill " on behalf of themselves and of the others ; and a bill may be " maintained against a portion of a numerous body of defend- " ants representing a common interest."

The appellees have the right to maintain this suit, notwithstanding the fact that the toll-gate of the appellants is a public nuisance; for the reason, that they show that they suffer an injury thereby which is distinct from that of the public in general ; and because the injury complained of is such that its continuance must occasion a constantly recurring grievance, which cannot be prevented otherwise than by an injunction. (Spencer *v.* London and Birmingham Railway Co., 8 Simons, 197 ; The State of Pennsylvania *v.* The Wheeling Bridge Co., 13 Howard, U. S., 560–562, 564 and 567 ; Frink *et al. v.* Laurence, 20 Conn., 117 ; Corning *v.* Lowerre, 6 Johnson's Chancery, 439 ; Mithau *v.* Sharp, 27 New York, 625 ; 2 Waterman's Ed. on Injunctions, 261, 267, 268 ; Story's Equity, Sections 924, 924*a* ; Green *et al. v.* Oakes, 17 Illinois, 250.)

In such cases, to prevent a multiplicity of suits and to settle the rights of all parties in one action, an injunction will be granted, and especially so when, as in this cause, the injury is continuous, and no other remedy will afford adequate relief.

(Pennsylvania Coal Co. *v.* the Delaware, etc., Canal Co., 31 New York, 91 ; Lord Tenham *v.* Herbert, 2 Atkyns, 483 ; Mohawk and Hudson R. R. Co. *v.* Artcher *et al.*, 6 Paige, 88 ; Story's Equity, Sections 853, 854, 855, 901, 924, 925, 928, 930.)

The bridge of the appellants is a part of the public highway or street, which every person has the right to travel upon without charge, unless the appellants have acquired, in some manner known to the law, the right to exact toll for the use of the same. (Dillon on Municipal Corporations, Sections 579, 441 ; Cooley's Constitutional Limitations, 396, note 1 ; Chicago *v.* Powers, 42 Ill., 169 : Manderschid *v.* Dubuque, 29 Iowa, 73 ; 19 Iowa, 25 ; Angel on Highways, Section 40 ; 1 Newburn, U. S. D. C. Mich., 1857, in case of Russell *v.* Empire State.)

To authorize the appellants to demand and receive toll from persons passing over their bridge, they must show that they have power, derived through a legislative grant, authorizing them so to do.

Chancellor Kent, in the third volume of his Commentaries (458), says : " Another class of incorporeal hereditaments are " franchises, being certain privileges conferred by grant from " the government, and vested in individuals.  *   *   *  The " privilege of making a road or establishing a ferry, and taking " tolls for the use of the same, is a franchise, and the public " have an interest in the same."

" A franchise is a branch of the royal prerogative in the " hands of the subject." (2 Black. Com., 37.), In the case of Prosser *v.* Wapello county (18 Iowa, 333, 334, 351), Judge Dillon, in delivering the opinion of the court, discusses the law upon this subject fully, and cites the decisions of the several State and Federal Courts upon the subject, and states, " That a party cannot set up a *public* ferry franchise, even on " his own land, without the consent of the State."

The decisions show, beyond controversy, that those who are authorized by law to exercise such rights, exercise them as the agents or trustees of the political power, and that they are in

no sense private, but continue after as well as before the grant to be but a portion of the power of the government delegated to the subject. (Middle Bridge *v*. Marks, 13 Shipley, Me., 328.)

It is not pretended that the appellants have any charter empowering them to demand toll; but they claim that through contracts made with the town of Victoria they have such rights. The contracts upon which the right is based are made a part of the appellants' answers.

This renders it necessary for us to consider the powers of the town under its charter : for it has no powers except such as are expressly given in its charter, or such as are necessarily or fairly implied in, or incident to the powers expressly granted, or essential to the declared objects or purposes of the corporation— not simply convenient, but indispensable. (Dillon on Municipal Corporations, Section 55; Miller *v*. Burch, 32 Texas, 210.) The rule is well expressed by Mr. Justice Nelson, in the case of Minturn *v*. Larue (23 Howard, 430), in the following language : " It is a well-settled rule of construction of grants by " the Legislature to corporations, whether public or private, " that only such powers and rights can be exercised under them " as are clearly comprehended within the words of the act or " derived therefrom by necessary implication, regard being had " to the object of the grant. Any ambiguity or doubt arising " out of the terms used by the Legislature must be resolved in " favor of the public. The principle has been so often applied " in the construction of corporate powers, that we need not " stop to refer to authorities." In Pennsylvania R. R. Co., *v*. Canal Commissioners (21 Penn. State 22), the Supreme Court of Pennsylvania used the following language : " When a State " means to clothe a corporate body with a portion of her own " sovereignty, and to disarm herself to that extent of the pow- "er that belongs to her, it is so easy to say so, that we will " never believe it to be meant where it is not said."

Before considering the powers of the town of Victoria itself, under its charter, another question may be properly considered,

which is: If the town by its charter had the power to construct and operate a toll bridge at the *locus in quo,* could the town delegate that right to the appellants?

The powers conferred upon the town of Victoria were conferred upon it for a public purpose, and as a public trust, and are delegated powers.

The Legislature, in conferring corporate powers upon the town, " have selected the depositary of the powers which they " designed should be exercised, and in confiding it to such de- " positary have impliedly prohibited its being exercised by any " other agency. A trust created for any public purpose can- " not be delegated at the will of the trustee." (Cooley's Con- stitutional Limitations, 205; Clark *v.* Washington, 12 Wheaton, 54; Dillon on Municipal Corporations, Section 60.) Judge Cooley, in his work on Constitutional Limitations (page 204), says: " Another and very important limitation which rests " upon municipal powers is, that they shall be executed by the " municipality itself, or by such agencies or officers as the " statute has pointed out." Judge Dillon, in his work on Municipal Corporations (Section 60), says: " The principle is a " plain one, that the public powers or trusts devolved by law " or charter upon the council or governing body, to be exer- " cised by it when and in such manner as it shall judge best, " cannot be delegated to others." (Oakland *v.* Carpentier, 13 Cal., 540; Whyte *v.* Nashville, 2 Swan, 364; Smith *v.* Morse, 2 Cal., 524.) In the absence of a provision in the charter authorizing the town to delegate the powers which it might itself exercise, it must follow that the appellants cannot claim any- thing by virtue of the contracts relied upon.

Judge Dillon, in his work on Municipal Corporations (Sec- tion 61), says: " Powers are conferred upon municipal corpora- " tions for public purposes, and as their legislative powers " cannot, as we have just seen, be delegated, so they cannot be " bargained or bartered away. Such corporations may make " authorized contracts, but they have no power, as a party, to " make contracts or pass by-laws which shall cede away, control

" or embarrass their legislative or governmental powers, or
" which shall disable them from performing their public duties.
" The cases cited illustrate this salutary principle in a great
" variety of circumstances, and, for the protection of the citi-
" zen, it is of the first importance that it shall be maintained by
" the courts in its full scope and vigor."

In illustration of the principle, see Milhau *v*. Sharp, 27 New
York, 618; 5 Cowen, 540; State *v*. Graves, 19 Maryland,
352; Dingman *v*. The People, 51 Illinois, 277; Davis *v*.
The Mayor, etc., 14 New York, 506; 3 Duer, 119; 8 Bush.,
415.

Upon the same subject, Judge Cooley says: "Equally in-
" cumbent upon the State Legislature and these municipal
" bodies, is the restriction that they shall not adopt irrepealable
" legislation. No legislative body can so part with its powers
" by any proceeding as not to be able to continue the exercise
" of them. It can, and should exercise them again and again,
" as often as the public interests require. Such a body has no
" power, even by contract, to control and embarrass its legisla-
" tive powers and duties." (Cooley's Constitutional Limita-
tions, 206; 13 Illinois, 413.)

The contracts upon which the appellants rely were not acts
of legislation, but had all of the elements of contracts, and, if
effective, would have the effect of depriving the municipal
government of the power, at any time prior to the year 1890, of
establishing, by ferry, bridge or ford, any crossing upon the
Guadalupe river, within the limits of the town.

The appellants claim that the town government had full
and ample control over all of its streets, highways, public
grounds, bridges, ferries, and water courses, and claim that in
regard thereto it was omnipotent. To this we answer, that all
of the power which it could exercise over these matters, was
a governmental power, which it could exercise only as the agent
of the State, through the legislative powers conferred upon its
Common Council, and that it was intrusted with such powers
as it possesses for the welfare of the local community, as well

as for the general public good; such powers as it had, it could neither surrender nor delegate.

Under such powers, and with means for the execution of the same, could the municipal government contract with the appellants, that for a period of twenty-five years, or for any period of time, that there should be no other means of crossing the Guadalupe for the distance of six miles, except such bridge or ferry as the appellants might erect; and that they should have for their own exclusive benefit, to the prejudice of all other people, the right during such time to obstruct all fords then in existence, over which the people could cross during the greater portion of the year without expense; that there should be but one means of exit from the town westward, and that that should be strictly guarded by the toll-gate of the appellants?

We think that no greater abuse or rather usurpation of corporate powers was ever attempted, and that the contracts in every part, for the reasons here stated, even if the town had the power itself to erect and operate a toll bridge, are void. (27 New York, 618; 3 Duer, 119; 5 Cowen, 538.)

A municipal corporation cannot lease or alienate any franchise or property necessary to enable it to perform its duties to the State, without an express legislative permission so to do. (The York, etc., R. Co. *v.* Winans, 17 How., U. S., 39; Commonwealth *v.* Smith, 10 Allen, 449; Richards *v.* Sibley, 11 Allen, 66.)

The next question is: Could the town of Victoria, under its charter, legally construct and operate a toll bridge at any point within the corporate limits? Under the sixth section of the charter, it is probably true that the town could legally have erected a free bridge at such point or points on the river as was necessary to the public good. (19 Iowa, 145.) The charter gave ample means to raise such funds as would have been necessary for that purpose. The charter does not in express terms confer the right, nor is it necessarily or fairly implied in or incident to the powers expressly granted, nor is it essential to the declared objects and purposes of the corporation.

If it was necessary to build a bridge or bridges, free struc-

tures would have supplied the necessity as fully as a toll bridge or bridges.

Then it cannot be said, that power to build a toll bridge was essential to the declared objects and purposes of the corporation.

The exercise of such a power may have been deemed convenient, but that it is convenient, in the absence of an express grant, is not sufficient to raise the power by implication; before such power will be implied, it must appear that the exercise of such power is indespensable.

In the case of Clark v. Des Moines (19 Iowa, 223) it was held that the city of Des Moines, under its charter, which in express terms gave it power to "improve sidewalks, alleys, and "streets; to make by-laws necessary and proper for the good "regulation, safety, and health of the city," had no power to erect a toll bridge. (See Bell v. Foucth, 21 Iowa, 119; Diveley v. The City of Cedar Falls, 27 Iowa, 231. See also Colton et al. v. Hanchett et al., 13 Ill.; Dillon on Mun. Cor., Section 580; see also the case of Russell v. the Empire State, 1 Newbern, U. S. D. C. Michigan, 542.)

The corporation could not embark in any business enterprise which is in any sense essentially private, although the same may be incidentally connected with that which pertains to its public duties. (Dillon on Mun. Cor., Section 106.)

The town has no powers derived from the colonization laws which would empower it to confer upon the appellants the rights which they claim. Under the instructions to commissioners, referred to by appellants (Paschal's Digest, 631, 632), it is evident that it was the intention thereby to impose upon the towns a duty, rather than to confer a right.

As riparian owner, the town held no property which it did not hold for a public purpose. In fact, under the ninth section of its charter, it held no property, whatever, which it did not hold as a public trust. (Bass v. Fauntleroy, 11 Texas, 698; The People v. Vanderbilt, 26 New York, 287; Dillon on Municipal Corporations, Section 40; Darlington v. Mayor, etc., 31 New York, 164, 193, 205.)

But if it be admitted that the town was a riparian owner in a private sense, it will not better the position of the appellants; for, as we have already seen, a mere riparian ownership will not authorize the owner, without a legislative grant, to erect and operate a toll bridge. (Dillon on Municipal Corporations, Sections 72–74; see also the opinion of Judge Dillon in Prosser v. Wapello county, 18 Iowa, 332, 333, and the decisions of the several State and Federal Courts referred to in the same for a full discussion of this question.)

Can the appellants claim any rights under prescription?

As a first reason why they cannot, their pleadings nowhere aver that the State ever granted such a franchise as appellants claim, even to the town itself. (Taylor v. Watkins, 26 Texas, 299.)

If the town could claim such a right as is claimed in this case, in any event, the facts pleaded are not sufficient; for it appears that the town, when operating a ferry, did so under the general law regulating the subject, and not by virtue of any right otherwise obtained.

During all of the time that Wheeler operated the bridge, not only were the inhabitants of the town given free passage over the same, but the like privilege was extended to the people of the county in their ordinary travel; and this privilege was continued to the inhabitants of the town under the contract made between the town and the appellants, under which the present bridge was built, until the 22d day of May, 1872, at which time, under the changed contract, the appellants for the first time set up their claim to demand toll from the inhabitants of the town.

If these facts existed they do not confer the prescriptive right claimed. For, "when a corporation is found to exist by "prescription, the same rule, as to construction of powers, we "apprehend, would apply as in other cases. The presumption "as to the powers granted, would be limited by the proof of the "usage, and nothing could be taken by intendment which the "usage did not warrant." (Cooley's Constitutional Limitations, 198.)

When we consider that in this case the appellants claim to exercise one of the highest prerogatives of the government, and that the written law of the land, which first called into existence the corporation through whom the right in this cause is claimed, is still in existence, whereby the powers which the State conferred upon it may be easily known, we very much question if the appellants, if the facts would ordinarily warrant it, could set up the right claimed by prescription.

Such an assertion of right is an assertion of right against the State, and it would seem that the maxim "*nullum tempus occurrit regi*" shall apply; this is especially true in all countries where corporations are created and their powers defined by a written law which may at any time be seen. In his work on Municipal Corporations, Section 56, Judge Dillon says: "A usage to give a right must, however, be long estab- "lished, and forty years' duration was not considered, of itself, "to be sufficient for this purpose. But usage in this country "has a much more limited operation."

In the case of Hood *v.* Lynn (1 Allen), 103, Chief Justice Bigelow says: "Usage cannot alter the case. An unlawful "expenditure of money cannot be rendered valid by usage, "however long continued. Abuses of power and violations of "right derive no sanction from time or custom."

The tribunal to which the power to authorize the construction of toll bridges was granted, was composed of the "county "commissioners, the justices of the peace, and the chief justice "of the County Court." (1 Laws, 145.)

This tribunal was abolished by the Constitution of 1845, and the Legislature empowered to organize inferior courts.

If the town, by its charter by the colonization law, nor by prescription had the right claimed, with the power to delegate, it must follow—the appellants having created a bridge in the public highway—that it is in their hands a free structure, just as it would have been had the town itself erected it, and this without reference to the fact that the appellants are holding under a contract under which the free ford was obstructed.

It is said by appellants that whatever the Legislature might do, the municipal corporation might do. We do not so understand the law. The power of the Legislature, subject only to the limitations placed upon it by the Constitutions of the State and of the United States, is supreme. Not so with the powers of a municipal government. Its charter is not only its constitution, but it alone enables it to exercise any power whatever, and it has no power except such as the State has thereby conferred upon it.

That the Legislature has power to confer upon a municipal corporation, with power to delegate them, such powers as are claimed for the town in this case, we do not question; but that the Legislature has not done so in this case we think beyond question.

Nor do we question, if the appellants had a charter empowering them to erect a toll bridge at the *locus in quo,* that the town would have the power to permit the use of the ground upon which it stands for that purpose; for, in that case, there would be an implied grant of power to the town, which it might exercise for or without a consideration, as it deemed best.

Nor do we question the power of the Legislature, by an express grant, to have conferred upon the appellants the right to use any part of the land held in trust by the town, for the purpose even of erecting thereon a toll bridge.

The appellees simply ask that the appellants be not permitted to do what the town could not legally have done; *i. e.,* that they be not permitted to erect upon the public highway a toll-gate, and that the appellees be permitted to use their bridge, which they have made a part of the highway, just as they can use any other part of the street.

The judgment gives this right, so long as the bridge of appellants stands where it does, under no authority other than the appellants have under the contracts on which they rely.

The appellants claim that the contracts are inviolable, because they are executed, and it would be unjust to them now to give a free crossing to the appellees after they have expended

money in the erection of their bridge. To this we answer, that at the time the bridge was erected the contract contemplated a free crossing to the inhabitants of the town, and the bridge was erected with that express understanding upon the part of the appellants, which they now seek to violate.

It is immaterial whether the roads and streets leading to the bridge were opened before it was constructed or not; for they are now the only avenues of ingress or egress for a distance of six miles, and without which the bridge would be valueless.

The evidence, however, shows conclusively, that for the last forty years the highways on the west side of the river have all entered upon the reservation, which is itself a public way, at or near the place where it now strikes the bridge—that the highway has been essentially the same during that time. It is said by the appellants that the decree "gives a free pass to probably five thousand persons, and to unknown numbers of wagons, cattle, horses, and other animals." That this is true, well illustrates the magnitude of the burden which the appellants have, in conjunction with the municipal authorities, attempted to impose upon the inhabitants of the town, for the purpose of enriching the appellants. From July, 1872, to September, 1873, according to the pleadings of the appellants (Rec., 68, 69), the charges of the appellants against the appellees (twenty-six in number) for toll, amounted to more than one thousand dollars.

At the same ratio, for all the inhabitants of the town, the money received in one year would build many such bridges as the appellants own; yet they deem it a hardship that the inhabitants complain of this incubus, and they now ask that the same remain until the year 1890.

ROBERTS, C. J.  Appellees obtained a decree, enjoining appellants from charging them toll upon a toll bridge across the Guadalupe River, in the city of Victoria, from which an appeal has been taken.

The questions in this case are:

*First.* Is the toll-gate kept on the bridge which prevents persons from crossing the river on it a nuisance ?

*Second.* Have the defendants in error (who are the plaintiffs below) sustained such special damages thereby, and have they such a common right as corporators as entitles them, for themselves and on behalf of their fellow-citizens of the city of Victoria, to maintain this suit to enjoin the defendants below (who are the plaintiffs in error) from obstructing their free passage over the bridge without paying the toll ?

The first question depends upon two propositions.

*First.* That the bridge is in and part of a public highway.

*Second.* That the defendants are keeping up thereon a toll-gate, and charging toll for passage over the bridge, and thereby exercising a public franchise, without any lawful authority.

Plaintiffs allege that the bridge was a part of the highway at the time the suit was brought, and ever since the iron bridge was put in operation, which was several years before the suit was brought. They allege that there was no other passage across the river within the town tract of four leagues square extending on both sides of the river ; that there was no public road on the west side of the river, or street on the east side, in the city proper, provided and kept up by the public authorities of the city or county of Victoria, to cross at any other place than at the bridge ; that the ford which the road formerly led to had been obstructed by the previous proprietor of (what was termed) the bridge franchise granted by the city, and such obstruction had been acquiesced in by the city and county; that the public road on the west side had been changed so as to come to the bridge, after it was built, and laid out and worked by the authority of the County Court; that the streets of the city led to the open levee, an open space of seventy-five varas in width out from the river bank (on both sides), dedicated by the city, and kept open, upon which the abutments of the bridge rested ; that the County Court recognized this bridge as being on and part of the highway by fixing the amount of toll that

should be charged; that the City Council procured it to be erected across the river, under a contract previously made with the original proprietor in 1865, and repeatedly confirmed to his successors, permitting all the other crossings to be obstructed, and binding the city to establish no other ferry or bridge during the continuance of the contract, which, under the extension granted, ends in 1890; that it is by virtue of this authority from the mayor and aldermen of the city alone, and by no grant from the County Court, or from the Legislature of the State, that defendants have erected and keep the toll bridge across the Guadalupe River, within the city limits of Victoria, one-fourth of the net proceeds of which are paid to the city, and three-fourths to the defendants; that said mayor and aldermen have no right to grant such a franchise to defendants, and that they have no such right from any source whatever; that the plaintiffs are corporators within the city limits, some of them residing on one side and some on the other of said river, and own land on the west side of the river, which is diminished in value by the charging of toll on said bridge, by which they sustain a special damage, and are also damaged by the payment of toll in passing to and from the city proper in the ordinary pursuit of their business, and that as corporators of said city, they have in common with all other corporators, for whom also they sue, a right to the free use and passage over the highways, levee and streets of said city, in which they are prevented by the toll-gate and charge of toll in passing over the bridge; by which it is a nuisance, from which they are entitled to be freed by the equitable powers of the court.

The defendants excepted to this petition generally and specially, which exceptions were overruled by the court.

Supposing it to be a nuisance in and part of the public highway of the city, as alleged, the plaintiffs stated facts which put them in a position to entitle them to bring a suit for equitable relief.

(Green *et al. v.* Oakes, 17 Ill. Rep., 249; Inhabitants of M st. *v.* City of New Orleans, 14 An. La. R., 455; Colton *et al.*

*v.* Hanchett, 13 Ill. R., 615 ; 2 Story's Eq. Jur., 924*a* ; Story's
Pleading, 102 to 118 ; 13 Howard, U. S., 564.)

It may not be improper to remark that plaintiffs might not
have been entitled, under their allegations, to all of the relief
which they obtained by the decree of the court unconditionally.
For, if the City Council had been made parties to the bill, as it
would seem most proper to be done, the injunction might have
been made to cease upon the highway being opened to the ford
as formerly, and a means of crossing furnished to the citizens
without being compelled to pass over the bridge.   That would
have restored them to their original rights and obviated any
complaint, or at least right of complaint, as it would now seem
to us, from the view we have of the case.   And another reason
why it is particularly appropriate to make the city a party in
this suit, in order to do full equity to all of the parties, is, that
if it be determined that the defendants have no authority to
erect a toll bridge, they should have the right to claim compen-
sation from the city for building a free bridge, or else be allowed
to take away the materials of their bridge, as the law and the
facts might be found to be in the premises.

The most important question, however, in this case, is, as to
whether or not the court erred in sustaining the exceptions of
plaintiffs to the defendants' special answers, in which they set
up the facts upon which they claimed the right to exercise the
franchise of keeping the toll bridge and charging toll thereat,
as they did.

This, indeed, is the great question in the case, not only as it
concerns the parties litigant, but the public in general.

The defendants, in their special answers, base their right
mainly on the power of the mayor and aldermen of the city to
grant to them this franchise.

The answers in support of the right of the City Council to
grant this franchise represent that, previous to 1836, in the
foundation of the town, the commissioner of the colony was
authorized by law to have a ferry established, the net proceeds
of which were to be a part of the public fund.   The charter

granted to the city in 1840 invested it with the ordinary powers of municipal government and police, without any reference to a ferry franchise.   Notwithstanding these, the City Council, as alleged in the answer, obtained from the County Court of Victoria county a license for a ferry.

In 1859 the City Council contracted for the building of a toll bridge, and, from that time to the bringing of this suit, the City Council assumed to grant the franchise of a toll bridge, or of a ferry in the absence of a bridge, two of them having been destroyed previous to the building of the iron bridge, and said franchise was sold from one person to another, and the transfer was recognized, and the terms of the franchise changed from time to time.   During all this time the County Court of Victoria county recognized the bridges built so far as to stipulate the amount of the toll to be charged, but never did directly grant, or assume to grant, the franchise.   All these, with other merely incidental facts, being alleged in the special answer, the right of the City Council to grant the franchise of the toll bridge as it existed at the time this suit was brought, was sought to be deduced from them on the following grounds:

*First.* As derived from the rights conferred upon the city by the colonization.

It is sufficient to say that these laws had no application to the condition of the city or its government after the change of government in 1836, and, at most, provided for the establishment of a public ferry through the agency of the commissioner of the colony.

*Second.* As derived from the rights of the city as riparian owner.

The riparian owner may be given a preference in the application for the right to exercise a franchise, but his position in that respect does not of itself confer the franchise.   (Prosser *v.* Wapello County, Justice Dillon, 18 Iowa Rep., 333; Paschal's Digest, Article 3841.)

*Third.*   As vested in the city by prescription.

A prescription presupposes a grant, which is not even alleged to have been made, otherwise than as contained in the colonization laws of Coahuila and Texas previously referred to, and as implied in the city charter of 1840 under the Republic of Texas. Ever since the claim of this right to grant the public franchise to build a toll bridge in 1859, and long previously, the mode of granting the franchise of a toll bridge has been by a notorious public act, such as an act of the Congress of the Republic, and afterward by act of the Legislature, or by the act of the County Court, which in both cases are evidenced by the public records of the country. Under such circumstances, the claim established by usage alone for twenty or thirty years would hardly be sufficient ground upon which to presume a grant, especially where there was no complaint of a loss or destruction of such records.

But then the usage itself has been qualified by continually getting the aid to the claim of the County Court in fixing the rates of toll, which is itself inconsistent with the claim of absolute right to the franchise.

*Fourth.* As conferred by the city charter in 1840.

This is the substantial ground of claim set up in the answer, and is predicated upon two clauses of the charter, as follows, to wit; " The Mayor and Aldermen shall have the power to " enact and enforce such ordinances and regulations as they "may deem necessary for the government of said town ; pro- " vided the same do not conflict with the Constitution and " laws of the Republic," and " shall have entire police of said " town."

It is contended, that as it is alleged that the river is within the corporate limits of the city, that the power is derived by implication from the above-expressed provisions to grant a franchise in a toll bridge constructed across the river.

Those above recited are the ordinary powers granted to towns and cities for the exercise of their municipal authority. The rule of construction is stated to be, that " a municipal cor- " poration possesses and can exercise the following powers and

3

" none others : *first*, those granted in express words ; *second*,
" those necessarily or fairly implied in, or incident to the
" powers expressly granted ; *third*, those essential to the ob-
" jects and purposes of the corporation, not simply convenient
" but indispensable. Any fair, reasonable doubt concerning
" the existence of the power, is resolved by the courts against
" the corporation. Of every municipal corporation the charter
" or statute by which it. is created is its organic act. Neither
" can the corporation do any act, or make any contract not au-
" thorized thereby. All acts beyond the scope of the powers
" granted are void." (Dillon on Corporations, Section 55,
101, 102 ; Minturn *v.* Larue, 23 Howard, 430. See opinion of
Justice Bradley in The Mayor *v.* Ray, 19 Wallace, United States
Rep., 475 ; Citizens S. & L. Ass. of Cleveland *v.* City of To-
peka, Supreme Court United States, October Term, 1874 ;
Penn. R. R. Co. *v.* Canal Commiss., 21 Penn. State R., 22.)

The general powers of municipal government granted to a
city or town cannot be delegated, nor can they be bargained
away, and they are to be exercised for public and not for pri-
vate purposes. (Dillon on Corp., Sections 60, 61, 108–110.)
Under these well-established rules, the extent of the authority
fairly to be implied from such general powers of municipal
government and police as contained in the charter, may be
deduced from the general purposes and objects for which towns
and cities are incorporated.

Those purposes and objects being peculiar to towns and cities
define generally the limits of municipal authority.

So far as it relates to the execution of the general laws of
the land, there is no more necessity for an incorporation in a
town or city, than in the country. Nor does the incorporation
exclude within its boundaries the operation of the general laws
as applicable to the whole country. But when people are
placed in close contact in a town, or city, the safety of property
and person there, the facility of transacting their business, the
preservation of their health, and the comforts and decencies of
good society in their midst, require a great many minor, though

important regulations too minute and varied for general laws, and which are peculiar to their condition.    These regulations are to be made in subordination, and not contrary to the general laws, still they go far beyond the general laws in prescribing the civil conduct of persons in relation to their personal conduct and property.    In order to make these additional regulations binding, the charter must be put in operation by an organization, or by the action of officers under it.    An act incorporating a town or city, therefore, is a law of the State, and more than an ordinary law; for it constitutes, when acted on, a sort of organic law, a constitution for a local self-government, within its territorial limits, extending in its scope to the extra regulations required for the good government of the city or town, to be enacted and carried into effect by its municipal officers.

Such are the peculiar powers granted to a city or town, in the general terms of government and police, as contained in the Charter of the city of Victoria; and thus is the extent of its implied municipal authority to be determined and limited.

It is none the less so because the inhabitants may be and are subject to the general laws, and some of its municipal officers may be invested by law with the authority to execute the general laws of the land, while at the same time they are executing those extra regulations that constitute the laws of the corporation, the municipal government.    From this view it is obvious that the general power of government and police, granted by the State government to the city of Victoria, in its charter of incorporation, would not embrace, by fair implication, the high governmental power of granting a franchise of a toll bridge to individuals.    That conclusion is strengthened by the fact, that from the terms of the charter the city limits extended both sides of the Guadalupe River, which must have been had in view by the Congress granting it, and still they made no express grant of such power.    It is further strengthened by the fact that in 1836 the Congress of the Republic passed a law authorizing the County Courts to grant and regulate the terms of

this franchise of erecting and keeping a toll bridge on streams within the body of their respective counties, which, while it was in force, furnished an easy mode of granting toll bridge privileges, and which provision, however, is not found in the latter acts regulating the powers of the County Court, and which has not for many years past been acted on as a subsisting law. (Paschal's Digest, 5244-6. See also Act of 1848, as to ferries and bridges, Article 1229.)

It is strengthened also by the fact that this has been generally regarded as so high a power of government, that charters for toll bridges and turnpikes have been generally, if not universally, granted by the direct legislation of the government in each instance.

Other objections to this attempted grant of a franchise by the Mayor and Aldermen of the city of Victoria, are found in their attempt to barter away their power of municipal government, and in embracing a private in a public enterprise. For the sum and substance of the whole transaction is, that they took in a partner to make a toll bridge for profit, as well as convenience of travel; they on their part furnishing the ground as riparian owners, and protection to the use of it as a toll bridge by their municipal authority, and allowing the fords to be obstructed and allowing them to remain so, and binding themselves not to make or grant permission to any other crossing of the river; the other partners, the bridge builders, were to furnish the capital, build the bridge, keep it in repair, collect the tolls, and divide the net proceeds, one-fourth to the city, and three-fourths to themselves, until 1890, when the bridge is to belong entirely to the city. But if this were decided to be legal, it might be, as it might have been, extended to 1980, as well as to 1890.

Notwithstanding the incalculable benefits to the State of such municipal governments, the generality of the powers granted, often from want of attention in framing their charters, and their liability to perversion to the accomplishment of private ends, admonish courts, as has been well said by a distin-

guished author, " to require of corporations, in all cases, to show " a plain and clear grant for the authority they assume to exer- " cise." (Dillon on Municipal Corporations, 25.) And when a power is claimed to grant a franchise to individuals, such as a toll bridge, which is usually granted directly by the Legislature in this State, and that power is not expressed, but sought to be implied from the general powers of municipal government and police that are expressly granted, if this be conceded, it might be difficult to see what limit there is to the creation and perpetuation of private monopolies, in the hands of favored individuals. This would be certain to introduce into city governments the wiles and struggles for power and influence, to be used for private aggrandizement under pretense of advancing the public good.

If the building and preservation of this bridge is necessary for the convenience, and conducive to the general interests of the inhabitants of the city, just as the opening and repair of its streets are, the city may have the right to build it as a free bridge, to be paid for in a way clearly within the scope of its municipal authority, by taxation, but not as a toll bridge, to be paid for by unequal burdens in the way of tolls, and resulting in embarking the city in a private partnership enterprise with individuals for profit, under the cover of exercising its municipal authority for the accomplishment of a public purpose.

(Mullarky, Adm., *v.* The Town of Cedar Falls, 19 Iowa, 23 ; Divley *v.* The City of Cedar Falls, 27 Iowa, 231 ; Dillon on Mun. Cor., Sections 580, 552, and Section 106 ; Colton *et al. v.* Hactchet *et al.*, 13 Ill. R., 615 ; Clark *v.* The City of Des-Moines, 19 Iowa R., 224 ; Bell *v.* Foutch, 21 Iowa R., 130 ; Citizens, etc., *v.* The City of Topeka, Sup. Co. U. S., October Term, 1874.)

We are of opinion that the special answers of the defendants did not set up any facts entitling them to exercise this important franchise of keeping a toll bridge on the Guadalupe river at Victoria, and that therefore the court did not err in sustaining plaintiffs' exceptions to said special answers.

Upon this ruling being had, the defendants obtained leave to amend, and filed a general denial, and went to trial, thereby imposing on the plaintiffs the burden of proving the material facts in his petition, affirmatively alleged, to wit, that the bridge at the time of bringing the suit was in and part of the public highway, as alleged, and that plaintiffs were corporators of the city, and were so situated, with reference to their business and property, as alleged, that they sustained special damages.

Upon the trial under this issue, all the facts as to the defendants' right were adduced before the jury in evidence, by the plaintiffs or defendants, notwithstanding the special answers had been dismissed. The statement of facts shows that there was brought before the jury, in addition to the written evidence and copies of records, witnesses who gave a full history of the different bridges, ferries, roads, and fords upon the river, and gave evidence as to the special damage to plaintiffs, and other matters involved in the issue there presented, and in which evidence there was considerable conflict.

The court charged the jury as follows: "It is admitted by "the defendants that the plaintiffs' residences and possessions "are as stated in their petition, and that they, the defendants, "erected, own, and charge the tolls for crossing the bridge, as "alleged in the plaintiffs' petition."

"The defendants have not shown any legal right to collect "said tolls from plaintiffs, they not being the riparian pro-"prietors of the banks of the river, without which proprietor-"ship they have no right to demand or receive tolls for cross-"ing passengers or freights over their bridge across the Gua-"dalupe river, in the town of Victoria; nor had the corporate "authorities of said town any authority of law to confer such "right upon them. The jury will therefore find for the "plaintiffs."

There are several objections to this charge.

*First.* It assumes facts which, so far as they were material, it was incumbent on the plaintiffs to prove.

*Second.* The facts assumed as a predicate for the verdict, were not sufficient, in and of themselves to shave, ustained the verdict if they had been proved.

*Third.* The shape of the charge is such as to dispense with the services of the jury entirely in their appropriate duty of finding the facts under the issue, according to the evidence adduced before them, in support of the material allegations of the plaintiffs' petition : the only province left them was to write the verdict as directed by the judge.

In a case in which there was no written evidence for the court to construe, but in which the proof was plainly in favor of the defendant, the court instructed the jury to find for the defendant. The Supreme Court of this State reversed the judgment on that account, and in the opinion say, " He direct- " ed the jury to find a verdict for the defendant. It was " going too far. It is doubtless what the jury ought to have " done, from the previous part of his charge on the law of the " case. It was his duty only to declare the law; this he had " done, and that correctly. He had no right to tell them that " they must find a verdict for either plaintiff or defendant." (Reynolds *v.* Wiliams, 1 Texas, 313.)

Where the court, in charging the jury, must declare the legal effect of admitted facts, or of records or other written evidence, to such an extent as to substantially decide the whole case, such a direct charge would not be error. (Mitchell *v.* De Witt, 20 Texas, 299 ; Reid *v.* Reid, 11 Texas, 593.) To go further would be a denial of the right of trial by a jury of the country.

The case now under consideration did not admit of such a charge, however plainly the facts in evidence may be deemed to be in favor of the plaintiffs. This follows from the nature of the facts, and the evidence offered in support of them, which were necessary to support the material allegations of the petition under the issue formed by a general denial pleaded by the defendants below.

Under the issue, it was incumbent on the plaintiffs to prove

such facts as would establish the bridge to be in and part of the public highway at the time the suit was brought; such affirmative facts as would establish, *prima facie* at least, that the defendants had no legal right to erect a gate and charge toll for crossing the bridge, not having a franchise therefor; and such facts as showed a common right as corporators, and a special damage. These facts were not admitted, nor were they or could they have been established by record or written evidence, to such an extent as to have justified this direct charge in favor of the plaintiffs below.

For this error the case should be reversed and remanded.

It is unnecessary to express any opinion as to the sufficiency of the evidence to sustain the allegations of the petition.

It is contended by the defendants that they have in good faith erected this bridge at great expense, under a contract with the mayor and aldermen, and that it is a great public benefit to the city, and that they will sustain great loss if this suit is allowed to prevail. In consideration of those facts, and in justice to them, it may not be improper to suggest that the mayor and aldermen should be made parties to this suit, so that the defendants may have their remedy against the city for compensation if they can show themselves legally entitled to demand the same for a beneficial public work made by them at the instance and for the benefit of the city, the use of which the city continues to enjoy. Or, as said in another part of the opinion, the city may re-open and make fit for use the ford and roads to it, so as to obviate the complaint of plaintiffs, leaving defendants and the State to settle the matter of continuing the exercise of such a public franchise. Or, if not these, some other means may be lawfully found, so as to do justice to all the parties concerned. These suggestions are made, of course, without indicating any positive direction, or opinion given in advance, as to the legality of any alternative course. The great learning and ability displayed in the arguments and briefs on both sides, give promise that the real equity of the case may be

reached, upon some such mode of proceeding, upon another trial, so that whatever wrong there may be, may be rectified with as little injury as practicable to any of the parties concerned, which should be the leading object in all courts, and especially in a court of equity.

The judgment is reversed and the cause remanded.

Reversed and remanded.